# THE STATE OF NEW HAMPSHIRE

# SUPREME COURT

**In Case No. 2018-0344, <u>Arnold Alpert & a. v. New Hampshire Motor Speedway, Inc. & a.</u>, the court on February 21, 2019 issued the following order:**

Having considered the briefs and the record submitted on appeal, the court concludes that a formal written opinion is unnecessary in this case. The plaintiffs, Arnold Alpert, Judith Elliott, and James Snyder, seek our review of an order of the Superior Court (<u>McNamara</u>, J.) granting summary judgment in favor of the defendants, New Hampshire Motor Speedway, Inc. (NHMS) and the Town of Loudon (Town). On appeal, the plaintiffs challenge the trial court's ruling that the term "premises," as used in a 1989 Settlement Agreement between certain residents of the Town and NHMS's predecessor in interest, did not apply to property acquired after the agreement was made. We affirm.

The following facts are taken from the trial court's summary judgment order and from undisputed documentary evidence contained in the record. In 1988, Robert Bahre, NHMS's predecessor in interest, purchased certain property, then known as the Bryar Motorsports Park, in Loudon, New Hampshire. At the time, the property consisted of two separate parcels that were in common ownership. One parcel contained a physical racetrack, which was owned by 106 Midway-Raceway, Inc., and shared a common boundary with the second parcel. Mr. Bahre purchased the property (containing both parcels) with the intention of building a racetrack suitable for National Association of Stock Car Racing (NASCAR) races, and formed a corporation called New Hampshire Speedway, Inc. (NHS) to achieve that purpose. Prior to Mr. Bahre's purchase, the racetrack primarily hosted motorcycle races and other smaller events.

In December 1988, the Loudon Planning Board approved NHS's proposed expansion of the racetrack. During this time frame, Mr. Bahre began referring to the racetrack as the "New Hampshire International Speedway" (NHIS). NHIS was the only property owned by NHS in December 1988. In January 1989, following the planning board's approval, James Snyder and three other individuals filed suit challenging the board's decision. Specifically, they sought review of the board's approval of NHS's site plan, alleging that their properties would be directly affected by the development. Although Arnold Alpert and Judith Elliott were not parties to this lawsuit, they were involved in the opposition to the proposed expansion; the pair created an informal group called "Concerned Racetrack Neighbors" that sought to mitigate the impact that the expansion would have on the community.

In May 1989, the parties ultimately agreed to settle the matter. In essence, the plaintiffs in the litigation, as well as Mr. Alpert and Ms. Elliott, agreed "to cease all opposition to the racetrack expansion" and, in return, NHS agreed to certain covenants that regulated its use of the property. The agreement, which is binding on NHS's successors, was filed in the Merrimack County Registry of Deeds.

In the years following the settlement, NHS purchased four more parcels of land in Loudon. In 2008, NHMS acquired NHS, including the land previously held by NHS in Loudon. Thereafter, the planning and zoning boards approved NHMS's request to host concerts on the properties that were acquired after the 1989 litigation. The plaintiffs filed suit, arguing that the 1989 settlement agreement barred NHMS from holding concerts on the land. On cross-motions for summary judgment, the trial court ruled that the 1989 agreement did not apply to the property acquired after the 1989 settlement. This appeal followed.

The question presented for our review is narrow: do the terms of the 1989 settlement apply to any and all property later acquired by NHS or its successors? The plaintiffs argue that they do. In their view, the term "premises," as used in the agreement, means all property that could reasonably be associated with NHMS's business. We disagree.

Because of their contractual nature, settlement agreements "are generally governed by principles of contract law." Poland v. Twomey, 156 N.H. 412, 414 (2007). "The interpretation of a contract, including whether a contract term is ambiguous, is ultimately a question of law for this court to decide." Sherman v. Graciano, 152 N.H. 119, 121 (2005). Thus, we review the trial court's interpretation de novo. Id. During our review, "we give the language used by the parties its reasonable meaning, considering the circumstances and the context in which the agreement was negotiated, and reading the document as a whole." Lawyers Title Ins. Corp. v. Groff, 148 N.H. 333, 336-37 (2002) (quotation omitted). In the absence of ambiguity, "the parties' intent will be determined from the plain meaning of the language used in the contract." Id. at 337 (quotation omitted). Contractual language will only be considered ambiguous "when the contracting parties reasonably differ as to its meaning." Appeal of Town of Durham, 149 N.H. 486, 487 (2003) (quotation omitted). Should we conclude that an ambiguity exists, we must then determine "what the parties, under an objective standard, mutually understood the ambiguous language to mean." Gen. Linen Servs. v. Franconia Inv. Assocs., 150 N.H. 595, 597 (2004).

Paragraph 1 of the agreement reads as follows: "New Hampshire Speedway covenants that it shall not permit any musical concerts of any type or description to be held on the premises currently known as New Hampshire International Speedway ('premises') except in conjunction with racing events."

2

Relying on State v. Thiel, 160 N.H. 462 (2010), the plaintiffs assert that the term "premises" refers to "the property which a reasonable observer would perceive to be part of NH Motor Speedway," including all land now associated with NHMS's business. The definition utilized in Thiel, however, does not support the conclusion that the plaintiffs desire.

In Thiel, the defendant was charged with shoplifting from a Wal-Mart store after being caught with merchandise in the store's vestibule. Id. at 463-64. At the time of the offense, the criminal statute prohibiting shoplifting required that the person "knowingly [remove] goods or merchandise from the premises of a merchant." Id. at 465 (quotation and ellipsis omitted). The defendant argued that she was erroneously convicted because she did not leave the premises with the merchandise. Id. We agreed, defining the term "premises" for purposes of the statute to mean "the place of business of an enterprise or institution." Id. at 466 (quotation and citation omitted). Our interpretation was further supported by the statutory scheme, which, at the time, defined two separate crimes: shoplifting and willful concealment. Id. Willful concealment required that the person conceal "the goods or merchandise . . . while still upon the premises of [the] store," whereas shoplifting required that the person remove the items from the store's premises. Id. Thus, defining "premises" to mean the entire business made sense given that the trial court's limitation of the term only to the sales area would have extinguished the need for two separate crimes, thereby placing the statutory language in direct conflict with the intent of the legislature. Id.

Here, however, the agreement specifies its reach — "the premises currently known as New Hampshire International Speedway." Unlike the statute at issue in Thiel, which dealt with a geographic location, the settlement agreement ties the definition of premises to a particular point in time — namely, 1989. Cf. 8A Lawrence's Anderson on the Uniform Commercial Code § 9-204:34, at 862 (3d ed. 2005) (noting that when a "security agreement describes the collateral as being owned by the debtor as of a certain date, it necessarily excludes after-acquired property"). Indeed, the term "currently" is defined to mean "at present." Webster's Third New International Dictionary 557 (unabridged ed. 2002).

Other portions of the agreement also expressly illustrate that its terms were only expected to govern the specific property owned in 1989. For example, the introductory paragraph states that the agreement was "in settlement of all claims arising from [the 1989 lawsuit] and all other objections to New Hampshire Speedway's proposed racetrack project." Paragraph 9 specifically required that NHS "install man-made barriers" on the premises and Paragraph 10 speaks of protecting the "Wetlands on the premises." Taken together, these provisions show that the parties to the settlement agreement were focused solely on the specific property owned by NHS in 1989 and crafted the agreement to squarely address the concerns surrounding the planned

3

expansion of the property at that specific point in time.  See Lawyers Title Ins. Corp., 148 N.H. at 336-37 (explaining that we must read the entire contract as a whole and in the context from which it arises).  Accordingly, we conclude that the trial court did not err.

Affirmed.

LYNN, C.J., and HICKS, HANTZ MARCONI, and DONOVAN, JJ., concurred.

**Eileen Fox,**
**Clerk**